# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 23, 2008　　　　　Decided July 29, 2008
Amended and Reissued November 21, 2008

No. 07-5276

FEDERAL TRADE COMMISSION,
APPELLANT

v.

WHOLE FOODS MARKET, INC., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 07cv01021)

———

*Marilyn E. Kerst*, Attorney, Federal Trade Commission, argued the cause for appellant. With her on the briefs were *John F. Daly*, Deputy General Counsel, and *Richard B. Dagen* and *Thomas H. Brock*, Attorneys.

*Paul T. Denis* argued the cause for appellees. With him on the brief were *Paul H. Friedman*, *Nory Miller*, and *Rebecca Dick*. *Clifford H. Aronson* and *Alden L. Atkins* entered appearances.

*David A. Balto* was on the brief for *amici curiae* American Antitrust Institute, et al. in support of appellant.

2

*Albert A. Foer* was on the brief for *amicus curiae* American Antitrust Institute in support of appellant.

Before: TATEL, BROWN, and KAVANAUGH, *Circuit Judges*.

Judgment of the Court filed by *Circuit Judge* BROWN.

Opinion filed by *Circuit Judge* BROWN.

Opinion concurring in the judgment filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

BROWN, *Circuit Judge*: The FTC sought a preliminary injunction, under 15 U.S.C. § 53(b), to block the merger of Whole Foods and Wild Oats. It appeals the district court's denial of the injunction. I conclude the district court should be reversed, though I do so reluctantly, admiring the thoughtful opinion the district court produced under trying circumstances in which the defendants were rushing to a financing deadline and the FTC presented, at best, poorly explained evidence. Nevertheless, the district court committed legal error in assuming market definition must depend on marginal consumers; consequently, it underestimated the FTC's likelihood of success on the merits.

I

Whole Foods Market, Inc. ("Whole Foods") and Wild Oats Markets, Inc. ("Wild Oats") operate 194 and 110 grocery stores, respectively, primarily in the United States. In February 2007, they announced that Whole Foods would acquire Wild Oats in a transaction closing before August 31,

3

2007. They notified the FTC, as the Hart-Scott-Rodino Act required for the $565 million merger, and the FTC investigated the merger through a series of hearings and document requests. On June 6, 2007, the FTC sought a temporary restraining order and preliminary injunction to block the merger temporarily while the FTC conducted an administrative proceeding to decide whether to block it permanently under § 7 of the Clayton Act. The parties conducted expedited discovery, and the district court held a hearing on July 31 and August 1, 2007.

The FTC contended Whole Foods and Wild Oats are the two largest operators of what it called premium, natural, and organic supermarkets ("PNOS"). Such stores "focus on high-quality perishables, specialty and natural organic produce, prepared foods, meat, fish[,] and bakery goods; generally have high levels of customer services; generally target affluent and well educated customers [and] . . . are mission driven with an emphasis on social and environmental responsibility." *FTC v. Whole Foods Market, Inc.*, 502 F. Supp. 2d 1, 28 (D.D.C. 2007). In eighteen cities, asserted the FTC, the merger would create monopolies because Whole Foods and Wild Oats are the only PNOS. To support this claim, the FTC relied on emails Whole Foods's CEO John Mackey sent to other Whole Foods executives and directors, suggesting the purpose of the merger was to eliminate a competitor. In addition the FTC produced pseudonymous blog postings in which Mr. Mackey touted Whole Foods and denigrated other supermarkets as unable to compete. The FTC's expert economist, Dr. Kevin Murphy, analyzed sales data from the companies to show how entry by various supermarkets into a local market affected sales at a Whole Foods or Wild Oats store.

4

On the other hand, the defendants' expert, Dr. David Scheffman, focused on whether a hypothetical monopolist owning both Whole Foods and Wild Oats would actually have power over a distinct market. He used various third-party market studies to predict that such an owner could not raise prices without driving customers to other supermarkets. In addition, deposition testimony from other supermarkets indicated they regarded Whole Foods and Wild Oats as critical competition. Internal documents from the two defendants reflected their extensive monitoring of other supermarkets' prices as well as each other's.

The district court concluded that PNOS was not a distinct market and that Whole Foods and Wild Oats compete within the broader market of grocery stores and supermarkets. Believing such a basic failure doomed any chance of the FTC's success, the court denied the preliminary injunction without considering the balance of the equities.

On August 17, the FTC filed an emergency motion for an injunction pending appeal, which this court denied on August 23. *FTC v. Whole Foods Market, Inc.*, No. 07-5276 (D.C. Cir. Aug. 23, 2007). Freed to proceed, Whole Foods and Wild Oats consummated their merger on August 28. The dissent argues that a reversal today contradicts this earlier decision, but our standard of review then was very different, requiring the FTC to show "such a substantial indication of probable success" that there would be "justification for the court's intrusion into the ordinary processes of . . . judicial review." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). It is hardly remarkable that the FTC could fail to meet such a stringent standard and yet persuasively show the district court erred in applying the much less demanding § 53(b) preliminary injunction standard.

5

II

At the threshold, Whole Foods questions our jurisdiction to hear this appeal.  The merger is a *fait accompli*, and Whole Foods has already closed some Wild Oats stores and sold others.  In addition, Whole Foods has sold two complete lines of stores, Sun Harvest and Harvey's, as well as some unspecified distribution facilities.  Therefore, argues Whole Foods, the transaction is irreversible and the FTC's request for an injunction blocking it is moot.

Only in a rare case would we agree a transaction is truly irreversible, for the courts are "clothed with large discretion" to create remedies "effective to redress [antitrust] violations and to restore competition."  *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972).  Indeed, "divestiture is a common form of relief" from unlawful mergers.  *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc).  Further, an antitrust violator "may . . . be required to do more than return the market to the *status quo ante*."  *Ford Motor*, 405 U.S. at 573 n.8.  Courts may not only order divestiture but may also order relief "designed to give the divested [firm] an opportunity to establish its competitive position."  *Id*. at 575.  Even remedies which "entail harsh consequences" would be appropriate to ameliorate the harm to competition from an antitrust violation.  *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 327 (1961).

Of course, neither court nor agency has found Whole Foods's acquisition of Wild Oats to be unlawful.  Therefore, the FTC may not yet claim the right to have any remedy necessary to undo the effects of the merger, as it could after such a determination, *du Pont*, 366 U.S. at 334.  But the whole point of a preliminary injunction is to avoid the need for intrusive relief later, since even with the considerable

6

flexibility of equitable relief, the difficulty of "unscrambl[ing] merged assets" often precludes "an effective order of divestiture," *FTC v. Dean Foods Co.*, 384 U.S. 597, 607 n.5 (1966). Section 53(b), codifying the ability of the FTC to obtain preliminary relief, *FTC v. Weyerhaeuser Co*., 665 F.2d 1072, 1082 (D.C. Cir. 1981), preserves the "flexibility" of traditional "equity practice," *id.* at 1084. At a minimum, the courts retain the power to preserve the *status quo nunc*, for example by means of a hold separate order, *id.*, and perhaps also to restore the *status quo ante*.

Thus, the courts have the power to grant relief on the FTC's complaint, despite the merger's having taken place, and this case is therefore not moot. *See Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) ("The availability of a partial remedy is sufficient to prevent [a] case from being moot."). The fact that Whole Foods has sold some of Wild Oats's assets does not change our conclusion. To be sure, we have no "authority to command return to the status quo," *Weyerhaeuser*, 665 F.2d at 1077, in a literal way by forcing absent parties to sell those assets back to Whole Foods, but there is no reason to think that inability prevents us from mitigating the merger's alleged harm to competition. The stores Whole Foods has sold are only those under the Harvey's and Sun Harvest labels, which were never relevant to the anticompetitive harm the FTC fears. Our inability to command their return does not limit the relief available to the FTC. As to the distribution facilities, neither party has described what they are, suggested Wild Oats would not be a viable competitor without them, or explained why the district court could not order some provisional substitute. Moreover, the FTC is concerned about eighteen different local markets. If, as appears to be the situation, it remains possible to reopen or preserve a Wild Oats store in just one of those markets,

7

such a result would at least give the FTC a chance to prevent a § 7 violation in that market.

## III

"We review a district court order denying preliminary injunctive relief for abuse of discretion." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001). However, if the district court's decision "rests on an erroneous premise as to the pertinent law," we will review the denial *de novo* "in light of the legal principles we believe proper and sound." *Id.*

Despite some ambiguity, the district court applied the correct legal standard to the FTC's request for a preliminary injunction. The FTC sought relief under 15 U.S.C. § 53(b), which allows a district court to grant preliminary relief "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." The relief is temporary and must dissolve if more than twenty days pass without an FTC complaint. *Id.* Congress recognized the traditional four-part equity standard for obtaining an injunction was "not appropriate for the implementation of a Federal statute by an independent regulatory agency." *Heinz*, 246 F.3d at 714. Therefore, to obtain a § 53(b) preliminary injunction, the FTC need not show any irreparable harm, and the "private equities" alone cannot override the FTC's showing of likelihood of success. *Weyerhaeuser*, 665 F.2d at 1082–83.

In deciding the FTC's request for a preliminary injunction blocking a merger under § 53(b), a district court must balance the likelihood of the FTC's success against the equities, under a sliding scale. *See Heinz*, 246 F.3d at 727; *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989).

8

The equities will often weigh in favor of the FTC, since "the
public interest in effective enforcement of the antitrust laws"
was Congress's specific "public equity consideration" in
enacting the provision. *Heinz*, 246 F.3d at 726. Therefore,
the FTC will usually be able to obtain a preliminary
injunction blocking a merger by "rais[ing] questions going to
the merits so serious, substantial, difficult[,] and doubtful as
to make them fair ground for thorough investigation." *Heinz*,
246 F.3d at 714–15. By meeting this standard, the FTC
"creates a presumption in favor of preliminary injunctive
relief," *id*. at 726; but the merging parties may rebut that
presumption, requiring the FTC to demonstrate a greater
likelihood of success, by showing equities weighing in favor
of the merger, *Weyerhaeuser*, 665 F.2d at 1087. Conversely,
a greater likelihood of the FTC's success will militate for a
preliminary injunction unless particularly strong equities
favor the merging parties. *See Heinz*, 246 F.3d at 727; *Elders
Grain*, 868 F.2d at 903.

In any case, a district court must not require the FTC to
prove the merits, because, in a § 53(b) preliminary injunction
proceeding, a court "is not authorized to determine whether
the antitrust laws . . . are about to be violated." *FTC v. Food
Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976). That
responsibility lies with the FTC. *Id.* Not that the court may
simply rubber-stamp an injunction whenever the FTC
provides some threshold evidence; it must "exercise
independent judgment" about the questions § 53(b) commits
to it. *Weyerhaeuser*, 665 F.2d at 1082. Thus, the district
court must evaluate the FTC's chance of success on the basis
of all the evidence before it, from the defendants as well as
from the FTC. *See FTC v. Beatrice Foods Co.*, 587 F.2d
1225, 1229–30 (D.C. Cir. 1978) (App'x to Stmt. of
MacKinnon & Robb, JJ.) ("[W]e are also required to consider
the inroads that the appellees' extensive showing has made

9

. . . [S]everal basic contentions of the FTC are called into serious question."). The district court should bear in mind the FTC will be entitled to a presumption against the merger on the merits, *see Elders Grain*, 868 F.2d at 906, and therefore does not need detailed evidence of anticompetitive effect at this preliminary phase. Nevertheless, the merging parties are entitled to oppose a § 53(b) preliminary injunction with their own evidence, and that evidence may force the FTC to respond with a more substantial showing.

The district court did not apply the sliding scale, instead declining to consider the equities. To be consistent with the § 53(b) standard, this decision must have rested on a conviction the FTC entirely failed to show a likelihood of success. Indeed, the court concluded "the relevant product market in this case is not premium natural and organic supermarkets . . . as argued by the FTC but . . . at least all supermarkets." *Whole Foods*, 502 F. Supp. 2d at 34. It also observed that several supermarkets "have already repositioned themselves to compete vigorously with Whole Foods and Wild Oats for the consumers' premium natural and organic food business." *Id*. at 48. Thus, considering the defendants' evidence as well as the FTC's, as it was obligated to do, the court was in no doubt that this merger would not substantially lessen competition, because it found the evidence proved Whole Foods and Wild Oats compete among supermarkets generally. If, and only if, the district court's certainty was justified, it was appropriate for the court not to balance the likelihood of the FTC's success against the equities.

IV

However, the court's conclusion was in error. The FTC contends the district court abused its discretion in two ways: first, by treating market definition as a threshold issue; and

10

second, by ignoring the FTC's main evidence.  The district court acted reasonably in focusing on the market definition, but it analyzed the product market incorrectly.

A

First, the FTC complains the district court improperly focused on whether Whole Foods and Wild Oats operate within a PNOS market.  However, this was not an abuse of discretion given that the district court was simply following the FTC's outline of the case.

Inexplicably, the FTC now asserts a market definition is not necessary in a § 7 case, Appellant's Br. 37–38, in contravention of the statute itself, *see* 15 U.S.C. § 18 (barring an acquisition "where in any line of commerce . . . the effect of such acquisition may be substantially to lessen competition"); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (interpreting "any line of commerce" to require a "determination of the relevant market" to find "a violation of the Clayton Act"); *Elders Grain*, 868 F.2d at 906 ("[A]ll this assumes a properly defined market.").  The FTC suggests "market definition . . . is a means to an end—to enable some measurement of market power—not an end in itself."  Appellant's Br. 38 n.26.  But measuring market power is not the only purpose of a market definition; only "examination of the particular market—its structure, history[,] and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe*, 370 U.S. at 322 n.38.

That is not to say market definition will always be crucial to the FTC's likelihood of success on the merits.  Nor does the FTC necessarily need to settle on a market defintion at this preliminary stage.  Although the framework we have

11

developed for a *prima facie* § 7 case rests on defining a market and showing undue concentration in that market, *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990), this analytical structure does not exhaust the possible ways to prove a § 7 violation on the merits, *see, e.g.*, *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 660 (1964), much less the ways to demonstrate a likelihood of success on the merits in a preliminary proceeding. Section 53(b) preliminary injunctions are meant to be readily available to preserve the status quo while the FTC develops its ultimate case, and it is quite conceivable that the FTC might need to seek such relief before it has settled on the scope of the product or geographic markets implicated by a merger. For example, the FTC may have alternate theories of the merger's anticompetitive harm, depending on inconsistent market definitions. While on the merits, the FTC would have to proceed with only one of those theories, at this preliminary phase it just has to raise substantial doubts about a transaction. One may have such doubts without knowing exactly what arguments will eventually prevail.[1] Therefore, a district court's assessment of the FTC's chances will not depend, in every case, on a threshold matter of market definition.

---

[1] For example, a merger between two close competitors can sometimes raise antitrust concerns due to unilateral effects in highly differentiated markets. *See generally* Horizontal Merger Guidelines, 57 Fed. Reg. 41,552, 41,560–61, § 2.2 (1992). In such a situation, it might not be necessary to understand the market definition to conclude a preliminary injunction should issue. The FTC alludes to this theory on appeal, but to the district court it argued simply that the merger would result in a highly concentrated PNOS market.

12

In this case, however, the FTC itself made market definition key. It claimed "[t]he operation of premium natural and organic supermarkets is a distinct 'line of commerce' within the meaning of Section 7," and its theory of anticompetitive effect was that the merger would "substantially increase concentration in the operation of [PNOS]." Compl. ¶¶ 34, 43. Throughout its briefs, the FTC presented a straightforward § 7 case in which "whether the transaction creates an appreciable danger of anticompetitive effects . . . depends upon . . . [the] relevant product . . . [and] geographic market . . . and the transaction's probable effect on competition in the product and geographic markets." FTC's Br. Mot. Prelim. Inj. 11–12. It purported to show "undue concentration in the relevant market," as the mainstay of its case. *Id.* at 12. Because of the concentration in the supposed PNOS market, the FTC urged the district court to hold the merger "presumptively unlawful," and this was its sole reason for blocking the merger. FTC's Proposed Conclusions of Law ¶¶ 57–63, 99–108. At oral argument, the FTC's counsel suggested it had other ideas about the anticompetitive effect of the merger even if its PNOS market definition is wrong; but the FTC never offered those ideas to the district court. It is incumbent on the parties to shape a case, and it was hardly an abuse of discretion for the district court to focus on the questions as the FTC presented them.

B

Thus, the FTC assumed the burden of raising some question of whether PNOS is a well-defined market. As the FTC presented its case, success turned on whether there exist core customers, committed to PNOS, for whom one should consider PNOS a relevant market. The district court assumed "the 'marginal' consumer, not the so-called 'core' or 'committed' consumer, must be the focus of any antitrust

13

analysis." *Whole Foods*, 502 F. Supp. 2d at 17 (citing Horizontal Merger Guidelines, 57 Fed. Reg. 41,552 (1992)). To the contrary, core consumers can, in appropriate circumstances, be worthy of antitrust protection. *See* Horizontal Merger Guidelines § 1.12, 57 Fed. Reg. at 41,555 (explaining the possibility of price discrimination for "targeted buyers"). The district court's error of law led it to ignore FTC evidence that strongly suggested Whole Foods and Wild Oats compete for core consumers within a PNOS market, even if they also compete on individual products for marginal consumers in the broader market. *See, e.g.*, Appellant's Br. 50, 53.

A market "must include all products reasonably interchangeable by consumers for the same purposes." *Microsoft*, 253 F.3d at 52. Whether one product is reasonably interchangeable for another depends not only on the ease and speed with which customers can substitute it and the desirability of doing so, *see id*. at 53–54, but also on the cost of substitution, which depends most sensitively on the price of the products. A broad market may also contain relevant submarkets which themselves "constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id*.

To facilitate this analysis, the Department of Justice and the FTC developed a technique called the SSNIP ("small but significant non-transitory increase in price") test, which both Dr. Murphy and Dr. Scheffman used. In the SSNIP method, one asks whether a hypothetical monopolist controlling all

14

suppliers in the proposed market could profit from a small price increase. Horizontal Merger Guidelines § 1.11, 57 Fed. Reg. at 41,560–61. If a small price increase would drive consumers to an alternative product, then that product must be reasonably substitutable for those in the proposed market and must therefore be part of the market, properly defined. *Id.*

Experts for the two sides disagreed about how to do the SSNIP of the proposed PNOS market. Dr. Scheffman used a method called critical loss analysis, in which he predicted the loss that would result when marginal customers shifted purchases to conventional supermarkets in response to a SSNIP.[2] *Whole Foods*, 502 F. Supp. 2d at 18. He concluded a hypothetical monopolist could not profit from a SSNIP, so that conventional supermarkets must be within the same market as PNOS. In contrast, Dr. Murphy disapproved of critical loss analysis generally, preferring a method called critical diversion that asked how many customers would be diverted to Whole Foods and how many to conventional supermarkets if a nearby Wild Oats closed. Whole Foods's internal planning documents indicated at least a majority of these customers would switch to Whole Foods, thus making the closure profitable for a hypothetical PNOS monopolist. One crucial difference between these approaches was that Dr. Scheffman's analysis depended only on the *marginal* loss of sales, while Dr. Murphy's used the *average* loss of customers. Dr. Murphy explained that focusing on the average behavior of customers was appropriate because a core of committed customers would continue to shop at PNOS stores despite a SSNIP.

---

[2] Dr. Scheffman did not actually calculate the amount of this loss. He simply predicted that because many Whole Foods and Wild Oats customers also shop at conventional supermarkets, the loss would at any rate be too large.

15

In appropriate circumstances, core customers can be a proper subject of antitrust concern. In particular, when one or a few firms differentiate themselves by offering a particular package of goods or services, it is quite possible for there to be a central group of customers for whom "only [that package] will do." *United States v. Grinnell Corp.*, 384 U.S. 563, 574 (1966); *see also United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970) ("[I]t is the *cluster* of products and services . . . that as a matter of trade reality makes commercial banking a distinct" market.). What motivates antitrust concern for such customers is the possibility that "fringe competition" for individual products within a package may not protect customers who need the whole package from market power exercised by a sole supplier of the package. *Grinnell*, 384 U.S. at 574.

Such customers may be captive to the sole supplier, which can then, by means of price discrimination, extract monopoly profits from them while competing for the business of marginal customers. *Cf. Md. People's Counsel v. FERC*, 761 F.2d 780, 786–87 (D.C. Cir. 1985) (allowing natural gas pipelines to charge higher prices to captive customers would be anticompetitive). Not that prices that segregate core from marginal consumers are in themselves anticompetitive; such pricing simply indicates the existence of a submarket of core customers, operating in parallel with the broader market but featuring a different demand curve. *See United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990). Sometimes, for some customers a package provides "access to certain products or services that would otherwise be unavailable to them." *Phillipsburg Nat'l Bank & Trust*, 399 U.S. at 360. Because the core customers require the whole package, they respond differently to price increases from marginal customers who may obtain portions of the package elsewhere. Of course, core customers may constitute a

16

submarket even without such an extreme difference in demand elasticity. After all, market definition focuses on what products are *reasonably* substitutable; what is reasonable must ultimately be determined by "settled consumer preference." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963).

In short, a core group of particularly dedicated, "distinct customers," paying "distinct prices," may constitute a recognizable submarket, *Brown Shoe*, 370 U.S. at 325, whether they are dedicated because they need a complete "cluster of products," *Phila. Nat'l Bank*, 374 U.S. at 356, because their particular circumstances dictate that a product "is the only realistic choice," *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir. 1981), or because they find a particular product "uniquely attractive," *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 112 (1984). For example, the existence of core customers dedicated to office supply superstores, with their "unique combination of size, selection, depth[,] and breadth of inventory," was an important factor distinguishing that submarket. *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1078–79 (D.D.C. 1997). As always in defining a market, we must "take into account the realities of competition." *Weiss v. York Hosp.*, 745 F.2d 786, 826 (3d Cir. 1984). We look to the *Brown Shoe* indicia, among which the economic criteria are primary, *see Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986).

The FTC's evidence delineated a PNOS submarket catering to a core group of customers who "have decided that natural and organic is important, lifestyle of health and ecological sustainability is important." *Whole Foods*, 502 F. Supp. at 223 (citing Hr'g Tr. 43–44, Aug. 1, 2007). It was undisputed that Whole Foods and Wild Oats provide higher

17

levels of customer service than conventional supermarkets, a "unique environment," and a particular focus on the "core values" these customers espoused. *Id.* The FTC connected these intangible properties with concrete aspects of the PNOS model, such as a much larger selection of natural and organic products, FTC's Proposed Findings of Fact 13–14 & ¶ 66 (noting Earth Fare, a PNOS, carries "more than 45,000 natural and organic SKUs") and a much greater concentration of perishables than conventional supermarkets, *id.* 14–15 & ¶ 69–70 ("Over 60% of Wild Oats' revenues" and "[n]early 70% of Whole Foods sales are natural or organic perishables."). *See also Whole Foods*, 502 F. Supp. 2d at 22–23 (citing defendants' depositions as evidence of Whole Foods's and Wild Oats's focus on "high-quality perishables" and a large variety of products).

Further, the FTC documented exactly the kind of price discrimination that enables a firm to profit from core customers for whom it is the sole supplier. Dr. Murphy compared the margins of Whole Foods stores in cities where they competed with Wild Oats. He found the presence of a Wild Oats depressed Whole Foods's margins significantly. Notably, while there was no effect on Whole Foods's margins in the product category of "groceries," where Whole Foods and Wild Oats compete on the margins with conventional supermarkets, the effect on margins for perishables was substantial. Confirming this price discrimination, Whole Foods's documents indicated that when it price-checked conventional supermarkets, the focus was overwhelmingly on "dry grocery," rather than on the perishables that were 70% of Whole Foods's business. Thus, in the high-quality perishables on which both Whole Foods and Wild Oats made most of their money, they competed directly with each other, and they competed with supermarkets only on the dry grocery items that were the fringes of their business.

18

Additionally, the FTC provided direct evidence that PNOS competition had a greater effect than conventional supermarkets on PNOS prices. Dr. Murphy showed the opening of a new Whole Foods in the vicinity of a Wild Oats caused Wild Oats's prices to drop, while entry by non-PNOS stores had no such effect. Similarly, the opening of Earth Fare stores (another PNOS) near Whole Foods stores caused Whole Foods's prices to drop immediately. The price effect continued, while decreasing, until the Earth Fare stores were forced to close.

Finally, evidence of consumer behavior supported the conclusion that PNOS serve a core consumer base. Whole Foods's internal projections, based on market experience, suggested that if a Wild Oats near a Whole Foods were to close, the majority (in some cases nearly all) of its customers would switch to the Whole Foods rather than to conventional supermarkets. Since Whole Foods's prices for perishables are higher than those of conventional supermarkets, such customers must not find shopping at the latter interchangeable with PNOS shopping. They are the core customers. Moreover, market research, including Dr. Scheffman's own studies, indicated 68% of Whole Foods customers are core customers who share the Whole Foods "core values." FTC Proposed Findings of Fact ¶ 135.

Against this conclusion the defendants posed evidence that customers "cross-shop" between PNOS and other stores and that Whole Foods and Wild Oats check the prices of conventional supermarkets. *Whole Foods*, 502 F. Supp. 2d at 30–32. But the fact that PNOS and ordinary supermarkets "are direct competitors in some submarkets . . . is not the end of the inquiry," *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 664 n.3 (1974). Of course customers cross-shop; PNOS carry comprehensive inventories. The fact that a customer

19

might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market. Here, cross-shopping is entirely consistent with the existence of a core group of PNOS customers. Indeed, Dr. Murphy explained that Whole Foods competes actively with conventional supermarkets for dry groceries sales, even though it ignores their prices for high-quality perishables.

In addition, the defendants relied on Dr. Scheffman's conclusion that there is no "clearly definable" core customer. *Whole Foods*, 502 F. Supp. 2d at 28. However, this conclusion was inconsistent with Dr. Scheffman's own report and testimony. Market research had found that customers who shop at Whole Foods because they share the core values it champions constituted at least a majority of its customers. Scheffman Expert Report 56–57. Moreover, Dr. Scheffman acknowledged "there are core shoppers [who] will only buy organic and natural" and for that reason go to Whole Foods or Wild Oats. Hr'g Tr. 31, July 31, 2007. He contended they could be ignored because the numbers are not "substantial." *Id*. Again, Dr. Scheffman's own market data undermined this assertion.

In sum, the district court believed the antitrust laws are addressed only to marginal consumers. This was an error of law, because in some situations core consumers, demanding exclusively a particular product or package of products, distinguish a submarket. The FTC described the core PNOS customers, explained how PNOS cater to these customers, and showed these customers provided the bulk of PNOS's business. The FTC put forward economic evidence—which the district court ignored—showing directly how PNOS discriminate on price between their core and marginal customers, thus treating the former as a distinct market. Therefore, I cannot agree with the district court that the FTC

20

would never be able to prove a PNOS submarket. This is not
to say the FTC has in fact proved such a market, which is not
necessary at this point. To obtain a preliminary injunction
under § 53(b), the FTC need only show a likelihood of
success sufficient, using the sliding scale, to balance any
equities that might weigh against the injunction.

V

It remains to address the equities, which the district court
did not reach, and see whether for some reason there is a
balance against the FTC that would require a greater
likelihood of success. The FTC urges us to carry out the rest
of this determination, but "[w]e believe the proper course of
action at this point is to remand to the district court,
*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d
290, 304 (D.C. Cir. 2006). Since the district court "expressly
withheld consideration," *id.* at 305, of the equities, we have
not had the benefit of its findings. Although the equities in a
§ 53(b) preliminary injunction proceeding will usually favor
the FTC, *Heinz*, 246 F.3d at 726, the district court must
independently exercise its discretion considering the
circumstances of this case, including the fact that the merger
has taken place. The district court should remember that a
"risk that the transaction will not occur at all," by itself, is a
private consideration that cannot alone defeat the preliminary
injunction. *See id.*; *Weyerhaeuser*, 665 F.2d at 1082–83.

I appreciate that the district court expedited the
proceeding as a courtesy to the defendants, who wanted to
consummate their merger just thirty days after the hearing,
*Whole Foods*, 502 F. Supp. 2d at 4, but the court should have
taken whatever time it needed to consider the FTC's evidence
fully. For the reasons stated above, the district court's
conclusion that the FTC showed no likelihood of success in

21

an eventual § 7 case must be reversed and remanded for
proceedings consistent with this opinion.

*So ordered.*

TATEL, *Circuit Judge*, concurring in the judgment: I agree with my colleagues that the district court produced a thoughtful opinion under incredibly difficult circumstances, that this case presents a live controversy, and that the district court generally applied the correct standard in reviewing the Federal Trade Commission's request for a preliminary injunction. I also agree with Judge Brown that the district court nonetheless erred in concluding that the FTC failed to "raise[] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714-15 (D.C. Cir. 2001). Specifically, I believe the district court overlooked or mistakenly rejected evidence supporting the FTC's view that Whole Foods and Wild Oats occupy a separate market of "premium natural and organic supermarkets."

I

"Section 7 of the Clayton Act prohibits acquisitions, including mergers, 'where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.'" *Id.* at 713 (quoting 15 U.S.C. § 18). "Congress used the words '*may be* substantially to lessen competition,' to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962).

When the FTC believes an acquisition violates section 7 and that enjoining the acquisition pending an investigation "would be in the interest of the public," section 13(b) of the Federal Trade Commission Act authorizes the Commission to ask a federal district court to block the acquisition. 15 U.S.C. § 53(b); *Heinz*, 246 F.3d at 714. Because Congress concluded

2

that the FTC—an expert agency acting on the public's behalf—should be able to obtain injunctive relief more readily than private parties, it "incorporat[ed] a unique 'public interest' standard in 15 U.S.C. § 53(b), rather than the more stringent, traditional 'equity' standard for injunctive relief." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (citing H.R. REP. NO. 93-624, at 31 (1973)). Under this more lenient rule, a district court may grant the FTC's requested injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). In this circuit, "the standard for likelihood of success on the merits is met if the FTC 'has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'" *Heinz*, 246 F.3d at 714-15 (quoting *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978) (Appendix to Joint Statement of Judges MacKinnon & Robb)); *accord FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984).

Critically, the district court's task is not "to determine whether the antitrust laws have been or are about to be violated. That adjudicatory function is vested in the FTC in the first instance." *Heinz*, 246 F.3d at 714 (quoting *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976)). As Judge Posner has explained:

> One of the main reasons for creating the Federal Trade Commission and giving it concurrent jurisdiction to enforce the Clayton Act was that Congress distrusted judicial

3

> determination of antitrust questions.  It thought
> the assistance of an administrative body would
> be helpful in resolving such questions and
> indeed expected the FTC to take the leading
> role in enforcing the Clayton Act . . . .

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986).

The dissent accuses Judge Brown and me of "dilut[ing] the standard for preliminary injunction relief in antitrust merger cases, such that the FTC . . . need not establish a likelihood of success on the merits."  Dissenting Op. at 17-18 (internal quotation marks omitted).  This is baffling given that our opinions scrupulously follow *Heinz*'s articulation of the likelihood-of-success standard, which even Whole Foods insists we apply, *see* Appellee's Br. 32 (urging that "the district court performed the role Congress delegated" to it by "applying the standard of review this Court prescribed in *Heinz*").  The Supreme Court's recent decision in *Munaf v. Geren*, 128 S. Ct. 2207 (2008), does nothing to undermine this precedent: it concerns the common law standard for preliminary injunctions, not section 13(b)'s "unique 'public interest' standard," *Exxon Corp.*, 636 F.2d at 1343.  *Cf.* Dissenting Op. at 20-21.  In his zeal to reach the merits and preempt the FTC, it is in fact our dissenting colleague who ignores both circuit precedent and section 13(b).

## II

In this case the district court concluded that the FTC had failed to raise the "serious, substantial" questions necessary to show a likelihood of success on the merits.  *FTC v. Whole Foods Market, Inc.*, 502 F. Supp. 2d 1, 49 (D.D.C. 2007).  Following the FTC's lead, the court focused on defining the

4

product market in which Whole Foods and Wild Oats operate, saying:

> [I]f the relevant product market is, as the FTC alleges, a product market of "premium natural and organic supermarkets" . . . , there can be little doubt that the acquisition of the second largest firm in the market by the largest firm in the market will tend to harm competition in that market. If, on the other hand, the defendants are merely differentiated firms operating within the larger relevant product market of "supermarkets," the proposed merger will not tend to harm competition.

*Whole Foods*, 502 F. Supp. 2d at 8. Thus, the "'case hinge[d]'—almost entirely—'on the proper definition of the relevant product market.'" *Id.* (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997)). And after reviewing the evidence, the district court concluded that "[t]here is no substantial likelihood that the FTC can prove its asserted product market and thus no likelihood that it can prove that the proposed merger may substantially lessen competition or tend to create a monopoly." *Id.* at 49-50.

I agree with the district court that this "'case hinges'—almost entirely—'on the proper definition of the relevant product market,'" for if a separate natural and organic market exists, "there can be little doubt that the acquisition of the second largest firm in the market by the largest firm in the market will tend to harm competition in that market." *Id.* at 8 (quoting *Staples*, 970 F. Supp. at 1073). But I respectfully part ways with the district court when it comes to assessing the FTC's evidence in support of its contention that Whole Foods and Wild Oats occupy a distinct market. As the

5

Supreme Court explained in *Brown Shoe Co. v. United States*: "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. at 325. In this case the FTC presented a great deal of credible evidence—either unmentioned or rejected by the district court—suggesting that Whole Foods and Wild Oats are not "reasonabl[y] interchangeab[le]" with conventional supermarkets and do not compete directly with them.

To begin with, the FTC's expert prepared a study showing that when a Whole Foods opened near an existing Wild Oats, it reduced sales at the Wild Oats store dramatically. *See* Expert Report of Kevin M. Murphy ¶¶ 48-49 & exhibit 3 (July 9, 2007) ("Murphy Report"). By contrast, when a conventional supermarket opened near a Wild Oats store, Wild Oats's sales were virtually unaffected. *See id.* This strongly suggests that although Wild Oats customers consider Whole Foods an adequate substitute, they do not feel the same way about conventional supermarkets. Rejecting this study, the district court explained that it was "unwilling to accept the assumption that the effects on Wild Oats from Whole Foods' entries provide a mirror from which predictions can reliably be made about the effects on Whole Foods from Wild Oats' future exits if this transaction occurs." *Whole Foods*, 502 F. Supp. 2d at 21. But even if exit and entry events differ, this evidence suggests that consumers do not consider Whole Foods and Wild Oats "reasonabl[y] interchangeab[le]" with conventional supermarkets. *Brown Shoe*, 370 U.S. at 325.

The FTC also highlighted Whole Foods's own study—called "Project Goldmine"—showing what Wild Oats customers would likely do after the proposed merger in cities where Whole Foods planned to close Wild Oats stores.

6

According to the study, the average Whole Foods store would capture most of the revenue from the closed Wild Oats store, even though virtually every city contained multiple conventional retailers closer to the shuttered Wild Oats store. *See* Murphy Report ¶ 70 & app. C; Rebuttal Expert Report of Kevin M. Murphy ¶¶ 31-32 (July 13, 2007) ("Murphy Rebuttal"). This high diversion ratio further suggests that many consumers consider conventional supermarkets inadequate substitutes for Wild Oats and Whole Foods. The district court cited the Project Goldmine study for the opposite conclusion, pointing only to cities in which Whole Foods expected to receive a low percentage of Wild Oats's business. *Whole Foods*, 502 F. Supp. 2d at 34. These examples, however, do not undermine the study's broader conclusion that Whole Foods would capture most of the revenue from the closed Wild Oats, and the district court never mentioned the FTC expert's testimony that the diversion ratio estimated here "is at least *four times* the diversion ratio[] needed to make a price increase of 5% profitable for a joint owner of the two stores." Murphy Rebuttal ¶ 32. The dissent also ignores this testimony, saying incorrectly that the Project Goldmine study "says nothing about whether Whole Foods could impose a five percent or more price increase." Dissenting Op. at 11.

Several industry studies predating the merger also suggest that Whole Foods and Wild Oats never truly competed with conventional supermarkets. For example, a study prepared for Whole Foods by an outside consultant concludes that "[Whole Foods] will not encounter significant, if any, competition from leading mainstream retailers['] (Safeway, Wal-Mart, Costco, etc.) entry into organics." Tinderbox Consulting, Exploring Private Label Organic Brands 4. Another study concludes that "[w]hile th[e] same consumer shops" at both "mainstream grocers such as

7

Safeway" and "large-format natural foods store[s] such as
Wild Oats or Whole Foods Market," "they tend to shop at
each for different things (e.g., Wild Oats for fresh and
specialty items, Safeway for canned and packaged goods)."
THE HARTMAN GROUP, ORGANIC 2006, at ch. 8, p. 1 (May 1,
2006). In addition, Wild Oats's former CEO, Perry Odak,
explained in a deposition why conventional stores have
difficulty competing with Whole Foods and Wild Oats: if
conventional stores offer a lot of organic products, they don't
sell enough to their existing customer base, leaving the stores
with spoiled products and reduced profits. But if
conventional stores offer only a narrow range of organic
products, customers with a high demand for organic items
refuse to shop there. Thus, "the conventionals have a very
difficult time getting into this business." Investigational
Hearing of Perry Odak 77-78 (quoted in Murphy Report ¶ 77)
("Odak Hearing"). The district court mentioned none of this.

   In addition to all this direct evidence that Whole Foods
and Wild Oats occupy a separate market from conventional
supermarkets, the FTC presented an enormous amount of
evidence of "industry or public recognition" of the natural and
organic market "as a separate economic entity"—one of the
"practical indicia" the Supreme Court has said can be used to
determine the boundaries of a distinct market. *Brown Shoe*,
370 U.S. at 325. For example, dozens of record studies about
the grocery store industry—including many prepared for
Whole Foods or Wild Oats—distinguish between "traditional"
or "conventional" grocery stores on the one hand and "natural
food" or "organic" stores on the other. *See, e.g.*, FOOD MKTG.
INST., U.S. GROCERY SHOPPER TRENDS 2007, at 20-22 (2007).
Moreover, record evidence indicates that the Whole Foods
and Wild Oats CEOs both believed that their companies
occupied a market separate from the conventional grocery
store industry. In an email to his company's board, Whole

8

Foods CEO John Mackey explained that "[Wild Oats] is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever." Email from John Mackey to John Elstrott et al. (Feb. 15, 2007). Echoing this point, former Wild Oats CEO Perry Odak said that "there's really only two players of any substance in the organic and all natural [market], and that's Whole Foods and Wild Oats. . . . [T]here's really nobody else in that particular space." Odak Hearing 58. Executives from several conventional retailers agreed, explaining that Whole Foods and Wild Oats are not "conventional supermarkets" because "they focus on a premium organic-type customer" and "don't sell a lot of the things that . . . a lot of people buy." Dep. of Rojon Diane Hasker 128-29 (July 10, 2007) ("Hasker Dep."). As Judge Bork explained, this evidence of "'industry or public recognition of the submarket as a separate economic' unit matters because we assume that economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986).

The FTC also presented strong evidence that Whole Foods and Wild Oats have "peculiar characteristics" distinguishing them from traditional supermarkets, another of the "practical indicia" the Supreme Court has said can be used to determine the boundaries of a distinct market. *Brown Shoe*, 370 U.S. at 325. Most important, unlike traditional grocery stores, both Whole Foods and Wild Oats carry only natural or organic products. *See* http://www.wholefoodsmarket.com/products/index.html ("We carry natural and organic products . . . unadulterated by artificial additives, sweeteners, colorings, and preservatives . . . ."). Glossing over this distinction, the dissent says "the dividing line between 'organic' and

9

conventional supermarkets has been blurred" because "[m]ost products that Whole Foods sells are not organic" while "conventional supermarkets" have begun selling more organic products.  Dissenting Op. at 8.  But the FTC never defined its proposed market as "organic supermarkets," it defined it as "premium natural and organic supermarkets."  And everything Whole Foods sells is natural and/or organic, while many of the things sold by traditional grocery stores are not.  *See, e.g.*, Hasker Dep. 130-34; http://www.wholefoodsmarket.com/prod ucts/unacceptablefoodingredients.html (explaining that Whole Foods refuses to carry any food item containing one of dozens of "unacceptable food ingredients," ingredients that can be found in countless products at traditional grocery stores).

Insisting that all this evidence of a separate market is irrelevant, Whole Foods and the dissent argue that the FTC's case must fail because the record contains no evidence that Whole Foods or Wild Oats charged higher prices in cities where the other was absent—i.e., where one had a local monopoly on the asserted natural and organic market—than they did in cities where the other was present.  This argument is both legally and factually incorrect.

As a legal matter, although evidence that a company charges more when other companies in the alleged market are absent certainly indicates that the companies operate in a distinct market, *see, e.g.*, *Staples*, 970 F. Supp. at 1075-77, that is not the *only* way to prove a separate market.  Indeed, *Brown Shoe* lists "distinct prices" as only one of a non-exhaustive list of seven "practical indicia" that may be examined to determine whether a separate market exists.  370 U.S. at 325.  Furthermore, even if the FTC could *prove* a section 7 violation only by showing evidence of higher prices in areas where a company had a local monopoly in an alleged market, the FTC need not *prove* a section 7 violation to obtain

10

a preliminary injunction; rather, it need only raise "serious, substantial" questions as to the merger's legality. *Heinz*, 246 F.3d at 714. Thus, the dissent misses the mark when it cites the FTC's Horizontal Merger Guidelines to suggest that the Commission may obtain a preliminary injunction only by "mak[ing] a sufficient showing that the merged company could . . . profitably impose a significant and nontransitory increase in price" of 5% or more. Dissenting Op. at 2 (internal quotation marks omitted). Such evidence in a case like this, which turns entirely on market definition, would be enough *to prove* a section 7 violation in the FTC's administrative proceeding. *See Hosp. Corp.*, 807 F.2d at 1389 (stating that "[a]ll that is necessary" to prove a section 7 case "is that the merger create an appreciable danger of [higher prices] in the future"). Yet our precedent clearly holds that to obtain a preliminary injunction "[t]he FTC is not required to *establish* that the proposed merger would in fact violate section 7 of the Clayton Act." *Heinz*, 246 F.3d at 714. Moreover, the Merger Guidelines—which "are by no means to be considered binding on the court," *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 n.4 (D.C. Cir. 1986)—specify how the FTC decides which cases to bring, "*not* . . . how the Agency will conduct the litigation of cases that it decides to bring," Horizontal Merger Guidelines § 0.1 (emphasis added); *see also id.* ("[T]he Guidelines do not attempt to assign the burden of proof, or the burden of coming forward with evidence, on any particular issue.").

In any event, the FTC did present evidence indicating that Whole Foods and Wild Oats charged more when they were the only natural and organic supermarket present. The FTC's expert looked at prices Whole Foods charged in several of its North Carolina stores before and after entry of a regional natural food chain called Earth Fare. Before any Earth Fare stores opened, Whole Foods charged essentially

11

the same prices at its five North Carolina stores, but when an Earth Fare opened near the Whole Foods in Chapel Hill, that store's prices dropped 5% below those at the other North Carolina Whole Foods. *See* Tr. of Mots. Hr'g, Morning Session 125-30 (July 31, 2007); Supplemental Rebuttal Expert Report of Kevin M. Murphy ¶¶ 2-6 (July 16, 2007) ("Murphy Supp."). Prices at that store remained lower than at the other Whole Foods in North Carolina for nearly a year, until just before the Earth Fare closed. *See* Murphy Supp. ¶¶ 4-5. Whole Foods followed essentially the same pattern when an Earth Fare opened near its stores in Raleigh and Durham— the company dropped prices at those stores but nowhere else in North Carolina. *See id.*; Tr. of Mots. Hr'g, Morning Session 127 (July 31, 2007). The FTC's expert presented similar evidence regarding Whole Foods's impact on Wild Oats's prices, showing that a new Whole Foods store opening near a Wild Oats caused immediate and lasting reductions in prices at that Wild Oats store compared to prices at other Wild Oats stores. *See* Tr. of Mots. Hr'g, Morning Session 132 (July 31, 2007); Murphy Report ¶¶ 57-59 & exhibit 5. In addition to this quantitative evidence, the FTC pointed to Whole Foods CEO John Mackey's statement explaining to the company's board why the merger made sense: "By buying [Wild Oats] we will . . . avoid nasty price wars in [several cities where both companies have stores]." Email from John Mackey to John Elstrott et al. (Feb. 15, 2007).

The dissent raises two primary arguments against this pricing evidence. First, it relies on a study by Whole Foods's expert to conclude that Whole Foods's prices remain steady regardless of the presence or absence of a nearby Wild Oats, Dissenting Op. at 5-6, calling this "all-but-dispositive price evidence," *id.* at 7. In fact, this study is all-but-meaningless price evidence because it examined Whole Foods's pricing on a single day several months *after* the company announced its

12

intent to acquire Wild Oats; this gave the company every incentive to eliminate any price differences that may have previously existed between its stores based on the presence of a nearby Wild Oats, not only to avoid antitrust liability, but also because the company was no longer competing with Wild Oats. *See Hosp. Corp.*, 807 F.2d at 1384 ("[E]vidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight."). Second, the dissent asserts that all Mackey's statements are irrelevant because—it claims—anticompetitive "intent is not an element of a § 7 claim." Dissenting Op. at 12. But the Supreme Court has clearly said that "evidence indicating the purpose of the merging parties, where available, *is an aid* in predicting the probable future conduct of the parties and thus the probable effects of the merger." *Brown Shoe*, 370 U.S. at 329 n.48 (emphasis added); *see also* 4A PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 964a (2d ed. 2006) ("[E]vidence of anticompetitive intent cannot be disregarded.").

To be sure, the pricing evidence here is unquestionably less compelling than the pricing evidence in some other cases, and perhaps this will make a difference in the Commission's ultimate evaluation of this merger. *Cf. Staples*, 970 F. Supp. at 1075-77 (showing price differences of up to 13% where competitors were absent). But at this preliminary, pre-hearing stage, the pricing evidence here, together with the other evidence described above, is certainly enough to raise "serious, substantial" questions that are "fair ground for thorough investigation, study, deliberation, and determination by the FTC." *Heinz*, 246 F.3d at 714-15.

Attempting to make these serious questions disappear, Whole Foods points to evidence the district court cited in concluding that the FTC could never prove a separate natural and organic market. That evidence, however, fails to

13

overcome the "serious, substantial" questions the FTC's evidence raises.

To begin with, the district court relied on a study by a Whole Foods expert concluding that the post-merger company would be unable to impose a statistically significant non-transitory increase in price because the "actual loss" from such an increase would exceed the "critical loss"—the point at which the revenue gained from raising prices equals the revenue lost from reduced sales. The FTC's expert, however, reached the exact opposite conclusion, finding that the combined company could impose a statistically significant non-transitory increase in price. Murphy Report ¶ 147. He also raised a number of criticisms of the Whole Foods expert's study. Most important, he pointed out that the Whole Foods expert "provide[d] literally no quantitative evidence for the magnitude of the Actual Loss . . . and no methodology for calculating the Actual Loss." Murphy Rebuttal ¶ 11. He further argued that the Whole Foods expert's study embodied a widely recognized flaw in critical loss analysis, namely that such analysis often overestimates actual loss when a company has high margins—which Whole Foods does. *See id.* ¶¶ 6-16 (explaining that when a company has high margins the critical loss is small, so one might predict an "Actual Loss greater than the Critical Loss," but "this story is very incomplete because a high margin tends to imply a small Actual Loss" given that high margins suggest customers are price insensitive (quoting Michael L. Katz & Carl Shapiro, *Further Thoughts on Critical Loss*, ANTITRUST SOURCE, March 2004, at 1, 2)); *see also* Daniel P. O'Brien & Abraham L. Wickelgren, *A Critical Analysis of Critical Loss Analysis*, 71 ANTITRUST L.J. 161, 162 (2003). In light of these cogent criticisms—which neither Whole Foods's expert nor the district court ever addressed—this study cannot eliminate the "serious, substantial" questions the FTC's evidence raises.

14

Although courts certainly must evaluate the evidence in section 13(b) proceedings and may safely reject expert testimony they find unsupported, they trench on the FTC's role when they choose between plausible, well-supported expert studies.

The district court next emphasized that when a new Whole Foods store opens, it takes business from conventional grocery stores, and even when an existing Wild Oats is nearby, most of the new Whole Foods store's revenue comes from customers who previously shopped at conventional stores. According to the district court, this led "to the inevitable conclusion that Whole Foods' and Wild Oats' main competitors are other supermarkets, not just each other." *Whole Foods*, 502 F. Supp. 2d at 21. As the FTC points out, however, "an innovative [product] can create a new product market for antitrust purposes" by "satisfy[ing] a previously-unsatisfied consumer demand." Appellant's Opening Br. 50. To use the Commission's example, when the automobile was first invented, competing auto manufacturers obviously took customers primarily from companies selling horses and buggies, not from other auto manufacturers, but that hardly shows that cars and horse-drawn carriages should be treated as the same product market. That Whole Foods and Wild Oats have attracted many customers away from conventional grocery stores by offering extensive selections of natural and organic products thus tells us nothing about whether Whole Foods and Wild Oats should be treated as operating in the same market as conventional grocery stores. Indeed, courts have often found that sufficiently innovative retailers can constitute a distinct product market even when they take customers from existing retailers. *See, e.g.*, *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712-14 (7th Cir. 1979) (finding a distinct market of drive-up photo-processing companies even though such companies took photo-

15

processing customers from drugstores, camera stores, and supermarkets); *Staples*, 970 F. Supp. at 1077 (finding a distinct market of office supply superstores even though such stores took sales primarily from mail-order catalogues and stores carrying a broader range of merchandise).

The district court also cited evidence that Whole Foods compares its prices to those at conventional stores, not just natural foods stores. But nearly all of the items on which Whole Foods checks prices are dry grocery items, even though nearly 70% of Whole Foods's revenue comes from perishables. Murphy Report ¶ 77. As Judge Brown's opinion explains, this suggests that any competition between Whole Foods and conventional retailers may be limited to a narrow range of products that play a minor role in Whole Foods's profitability. Op. at 17.

Finally, the district court observed that more and more conventional stores are carrying natural and organic products, and that consumers who shop at Whole Foods and Wild Oats also shop at conventional stores. But as noted above, other record evidence suggests that although some conventional retailers are beginning to offer a limited range of popular organic products, they have difficulty competing with Whole Foods and Wild Oats. *See* Murphy Report ¶ 77. As Whole Foods CEO John Mackey put it: "[Wild Oats] is the *only existing company* that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means *eliminating this threat forever, or almost forever*." Email from John Mackey to John Elstrott et al. (Feb. 15, 2007) (emphasis added). Other studies show that "[w]hile th[e] same consumer shops" at both "mainstream grocers such as Safeway" and "large-format natural foods store[s] such as Wild Oats or Whole Foods," "they tend to shop at each for different things." THE

16

HARTMAN GROUP, ORGANIC 2006, at ch. 8, p. 1 (May 1, 2006); *see also Photovest*, 606 F.2d at 714 ("The law does not require an exclusive class of customers for each relevant submarket.").

In sum, much of the evidence Whole Foods points to is either entirely unpersuasive or rebutted by credible evidence offered by the FTC. Of course, this is not to say that the FTC will necessarily be able to prove its asserted product market in an administrative proceeding: as the district court recognized, Whole Foods has a great deal of evidence on its side, evidence that may ultimately convince the Commission that no separate market exists. But at this preliminary stage, the FTC's evidence plainly establishes a reasonable probability that it will be able to prove its asserted market, and given that this "'case hinges'—almost entirely—'on the proper definition of the relevant product market,'" *Whole Foods*, 502 F. Supp. 2d at 8 (quoting *Staples*, 970 F. Supp. at 1073), this is enough to raise "serious, substantial" questions meriting further investigation by the FTC, *Heinz*, 246 F.3d at 714.

III

Because we have decided that the FTC showed the requisite likelihood of success by raising serious and substantial questions about the merger's legality, all that remains is to "weigh the equities in order to decide whether enjoining the merger would be in the public interest." *Id.* at 726. Although in some cases we have conducted this weighing ourselves, *see, e.g.*, *id.* at 726-27, three factors lead me to agree with Judge Brown that the better course here is to remand to the district court for it to undertake this task. First, in cases in which we have weighed the equities, the district court had already done so, giving us the benefit of its factfinding and reasoning. *See, e.g.*, *id.* Here, by contrast, the district court never reached the equities and the parties have

17

not briefed the issue, leaving us without the evidence needed to decide this question. *See Whole Foods*, 502 F. Supp. 2d at 50. Second, this case stands in a unique posture, for in cases where we reversed a district court's denial of a section 13(b) injunction, either the district court or this court had enjoined the merger pending appeal. *See Heinz*, 246 F.3d at 713; *PPG Indus.*, 798 F.2d at 1501 n.1. Here, by contrast, the companies have already merged, and although this doesn't moot the case, it may well affect the balance of the equities, likely requiring the district court to take additional evidence. Finally, given this case's unique posture, the usual remedy in section 13(b) cases—blocking the merger—is no longer an option. Therefore, if the district court concludes that the equities tilt in the FTC's favor, it will need to craft an alternative, fact-bound remedy sufficient to achieve section 13(b)'s purpose, namely allowing the FTC to review the transaction in an administrative proceeding and reestablish the premerger status quo if it finds a section 7 violation. To accomplish this, the district court could choose anything from issuing a hold separate order, *see FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083-84 (D.C. Cir. 1981), to enjoining further integration of the companies, to ordering the transaction partially or entirely rescinded, *see FTC v. Elders Grain*, 868 F.2d 901, 907-08 (7th Cir. 1989) (Posner, J.). Without more facts, however, we are in no position to suggest which remedy is most appropriate.

Given the novel and significant task the district court faces on remand, I think it important to emphasize the principles that should guide its weighing of the equities. To begin with, as this court has held, "a likelihood of success finding weighs heavily in favor of a preliminary injunction blocking the acquisition," *Weyerhaeuser*, 665 F.2d at 1085, "creat[ing] a presumption in favor of preliminary injunctive relief," *Heinz*, 246 F.3d at 726. That said, the district court

18

must still weigh the public and private equities "to decide whether enjoining the merger would be in the public interest." *Id.* "The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws." *Id.* That is, because "[a]dministrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture" after administrative proceedings, *FTC v. Dean Foods Co.*, 384 U.S. 597, 607 n.5 (1966), the court must place great weight on the public interest in blocking a possibly anticompetitive merger before it is complete. Here, of course, the merger has already been consummated, although as the FTC points out, the process of combining the two companies is far from complete. Thus, the district court must consider the extent to which any of the remedial options mentioned above would make it easier for the FTC to separate Wild Oats and Whole Foods after the Commission's administrative proceeding (should it find a section 7 violation) than it would be if the court did nothing. The court must then weigh this and any other equities opposing the merger against any public and private equities that support allowing the merger to proceed immediately.

In conducting this weighing, if Whole Foods can show no public equities in favor of allowing the merger to proceed immediately—such as increased employment or reduced prices—the district court should go no further, for "[w]hen the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone [does] not suffice to justify denial of a preliminary injunction barring the merger." *Weyerhaeuser*, 665 F.2d at 1083. But if Whole Foods can show some public equity favoring the merger, then the court should also consider private equities on Whole Foods's side of the ledger, such as whether it would allow an otherwise failing

19

firm to survive. That said, "[w]hile it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight, lest we undermine section 13(b)'s purpose of protecting the public-at-large, rather than the individual private competitors." *Heinz*, 246 F.3d at 727 n.25 (quoting *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991)) (internal quotation marks omitted). Moreover, "[w]e do not rank as a private equity meriting weight a mere expectation of private gain from a transaction the FTC has shown is likely to violate the antitrust laws." *Weyerhaeuser*, 665 F.2d at 1083 n.26. In other words, even if allowing the merger to proceed would increase Whole Foods's profits, that is irrelevant to the private equities under section 13(b).

KAVANAUGH, *Circuit Judge*, dissenting:[1]  The Federal Trade Commission has sought a preliminary injunction to block the Whole Foods-Wild Oats merger as anticompetitive under § 7 of the Clayton Act.  As in many antitrust cases, the analysis comes down to one issue: market definition.  Is the relevant product market here *all* supermarkets?  Or is the relevant product market here only so-called "organic supermarkets"?  If the former, as Whole Foods argues, the Whole Foods-Wild Oats merger would be lawful because it would not lessen competition in the broad market of all supermarkets:  Whole Foods and Wild Oats together operate about 300 of the approximately 34,000 supermarkets in the United States.  If the latter, as the FTC contends, the merger may be unlawful: Whole Foods and Wild Oats are the only significant competitors in the alleged organic-store market and their merger would substantially lessen competition in such a narrowly defined market.

More than a year ago, after a lengthy evidentiary hearing and in an exhaustive and careful opinion, the District Court found that the record evidence overwhelmingly supports the following conclusions:  Whole Foods competes against all supermarkets and not just so-called organic stores; the relevant market for evaluating this merger for antitrust purposes is all supermarkets; and the merger of Whole Foods and Wild Oats would not substantially lessen competition in a market that includes all supermarkets.  The court therefore denied the FTC's motion for a preliminary injunction.

---

[1] In light of changes made by Judge Brown and Judge Tatel to their opinions in response to the petition for rehearing – most notably, the fact that Judge Tatel no longer joins Judge Brown's opinion, meaning there is no majority opinion for the Court – this dissent contains changes throughout, including a new Part III, from the dissenting opinion released on July 29, 2008.

2

Also more than a year ago, a three-judge panel of this Court unanimously denied the FTC's request for an injunction pending appeal, thereby allowing the Whole Foods-Wild Oats deal to close. Since then, the merged entity has shut down, sold, or converted numerous Wild Oats stores and otherwise effectuated the merger through many changes in supplier contracts, leases, distribution, and the like.

The Court's splintered decision in this case seeks to unring the bell. In my judgment, this Court got it right a year ago in refusing to enjoin the merger, and there is no basis for a changed result now. Both a year ago and now, the same central question has been before the Court in determining whether to approve an injunction: whether the FTC demonstrated the necessary "likelihood of success" on its § 7 case. A year ago, the Court said no. Now, the Court says yes. The now-merged entity, the industry, and consumers no doubt will be confused by this apparent judicial about-face.

The law does not allow the FTC to just snap its fingers and temporarily block a merger. Even at the preliminary injunction stage, the relevant statutory text and precedents expressly require that the FTC show a "likelihood of success on the merits." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001); *see also* 15 U.S.C. § 53(b) ("likelihood of ultimate success"); *cf. Munaf v. Geren*, 128 S. Ct. 2207, 2218-19 (2008). Because "[m]erger enforcement, like other areas of antitrust, is directed at market power," *Heinz*, 246 F.3d at 713, the FTC therefore needs to make a sufficient showing that the merged company could exercise market power and profitably impose a "small but significant and nontransitory increase in price," typically meaning a five percent or greater price increase. Horizontal Merger Guidelines § 1.11 (internal quotation marks omitted); *see* 15 U.S.C. § 18. As the District Court concluded, the FTC did not come close to presenting

3

that kind of evidence in this case; the FTC completely failed to make the economic showing that is Antitrust 101.

By seeking to block a merger without a sufficient showing that so-called organic stores constitute a separate product market and that the merged entity could impose a significant and nontransitory price increase, the FTC's position – which Judge Brown and Judge Tatel largely accept – calls to mind the bad old days when mergers were viewed with suspicion regardless of their economic benefits.  *See generally* ROBERT H. BORK, THE ANTITRUST PARADOX (1978).  I would not turn back the clock.  I agree with and would affirm the District Court's excellent decision denying the FTC's motion to enjoin the merger of Whole Foods and Wild Oats.  *See FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1 (D.D.C. 2007).

I

A

Section 7 of the Clayton Act prohibits mergers "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."   15 U.S.C. § 18.   The Horizontal Merger Guidelines jointly promulgated by two Executive Branch agencies (the Department of Justice and the FTC) implement that statutory directive and recognize that the key initial step in the analysis is proper product-market definition.  *See* Horizontal Merger Guidelines § 1.11; *see also* 2B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 536, at 284-85 (3d ed. 2007).  Proper product-market analysis focuses on products' interchangeability of use or cross-elasticity of demand.  A product "market can be seen as the array of

4

producers of substitute products that could control price if united in a hypothetical cartel or as a hypothetical monopoly." *Id.* ¶ 530a, at 226. In the merger context, the inquiry therefore comes down to whether the merged entity could profitably impose a "small but significant and nontransitory increase in price" typically defined as five percent or more. *See* Horizontal Merger Guidelines § 1.11 (internal quotation marks omitted). If the merged entity could profitably impose at least a five percent price increase (because the price increase would not cause a sufficient number of consumers to switch to substitutes outside of the alleged product market), then there is a distinct product market and the proposed merger likely would substantially lessen competition in that market, in violation of § 7 of the Clayton Act.

In considering whether the merged entity could increase prices, courts of course recognize that "future behavior must be inferred from historical observations." 2B AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 530a, at 226. Therefore, the courts scrutinize existing markets to assess the probable effects of a merger.

This approach was applied sensibly by Judge Hogan in his thorough and leading opinion in *FTC v. Staples*, 970 F. Supp. 1066 (D.D.C. 1997). There, Judge Hogan found that office products sold by an office superstore were functionally interchangeable with office products sold at other types of stores, but he nonetheless found that office-supply superstores constituted a distinct product market. One key fact led Judge Hogan to that conclusion: In areas where Staples was the only office superstore, it was able to set prices significantly higher than in areas where it competed with other office superstores (Office Depot and OfficeMax). *See id.* at 1075-76. For example, the FTC presented "compelling evidence" that Staples's prices were 13 percent higher in areas where no

5

office-superstore competitors were present. *Id.* Judge Hogan
ultimately concluded that "[t]his evidence all suggests that
office superstore *prices* are affected primarily by other office
superstores and not by non-superstore competitors." *Id.* at
1077 (emphasis added). For that reason, the Court enjoined
the merger of Staples and Office Depot.

B

Consistent with the statute, the Executive Branch's
Merger Guidelines, and Judge Hogan's convincing opinion in
*Staples*, the District Court here carefully analyzed the
economics of supermarkets, including so-called organic
supermarkets. The court considered whether Whole Foods
charged higher prices in areas without Wild Oats than in areas
with Wild Oats. After an evidentiary hearing and based on a
painstaking review of the evidence in the record, the court
concluded that "Whole Foods prices are essentially the same
at all of its stores in a region, regardless of whether there is a
Wild Oats store nearby." *FTC v. Whole Foods Mkt., Inc.*, 502
F. Supp. 2d 1, 22 (D.D.C. 2007). That factual conclusion was
supported by substantial evidence offered by Dr. Scheffman,
Whole Foods's expert, and by the lack of any credible
evidence to the contrary.

Dr. Scheffman analyzed Whole Foods's actual prices
across stores and concluded that "there is no evidence that
[Whole Foods] and [Wild Oats] price higher" where they face
no competition from so-called organic supermarkets
compared with where they do face such competition.
Scheffman Expert Report ¶ 292, at 113. At a regional level,
his studies revealed that only a "very small percentage" of
products vary in price within a region, indicating that "prices
are set across broad geographic areas." *Id.* ¶ 300, at 116. He
also analyzed prices at the individual store level, examining

6

how many products sold at a specific store have prices that differ from the most common price in the region. He found that "differences in prices across stores are generally very small (less than one half of one percent) and there is no systematic pattern as to the presence or absence of [organic-supermarket] competition." *Id.* ¶ 305, at 116.

Moreover, the record evidence in this case does not show that Whole Foods changed its prices in any significant way in response to exit from an area by Wild Oats. In the four cases where Wild Oats exited and a Whole Foods store remained, there is no evidence in the record that Whole Foods then raised prices. Nor was there any evidence of price increases after Whole Foods took over two Wild Oats stores.

The facts here contrast starkly with *Staples*, where Staples charged significantly different prices based on the presence or absence of office-superstore competitors in a particular area. The evidence there showed that Staples charged prices 13 percent higher in markets without office-superstore competitors than in markets with such competitors. There is nothing remotely like that in this case.

In the absence of any evidence in the record that Whole Foods was able to (or did) set higher prices when Wild Oats exited or was absent, the District Court correctly concluded that Whole Foods competes in a market composed of all supermarkets, meaning that "all supermarkets" is the relevant product market and that the Whole Foods-Wild Oats merger will not substantially lessen competition in that product market.

7

In addition to the all-but-dispositive price evidence,[2] the District Court identified other factors further demonstrating that the relevant market consists of all supermarkets.

The record shows that Whole Foods makes site selection decisions based on all supermarkets and checks prices against all supermarkets, not only so-called organic supermarkets. As Dr. Scheffman concluded, Whole Foods "price checks a broad set of competitors . . . nationally, regionally and locally." *Id.* ¶ 224, at 86. This "demonstrates that [Whole Foods] views itself as competing with a broad range of supermarkets and that these supermarkets, in fact, constrain the prices charged by [Whole Foods]." *Id.* Those other supermarkets include conventional supermarkets such as Safeway, Albertson's, Wegman's, HEB, and Harris Teeter, as well as so-called organic supermarkets like Wild Oats. *Id.* ¶¶ 225-26, at 86-87. As Professors Areeda and Hovenkamp have explained, a "broad-market finding gains some support from long-standing documents indicating that *A* or *B* producers regard the other product as a close competitor." 2B AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 562a, at 372. The point here is simple: Whole Foods would not examine the locations of and price check conventional grocery stores if it were not a competitor of those stores. Whole Foods does not price check Sports Authority; Whole Foods does price check Safeway.

The record also demonstrates that conventional supermarkets and so-called organic supermarkets are aggressively competing to attract customers from one another. After reviewing a wide variety of industry information and

---

[2] Judge Tatel's opinion disparages the evidence about Whole Foods's prices, calling it "all-but-meaningless" and implicitly suggesting that Whole Foods manipulated its prices just for the expert study. Tatel Op. at 11. But Judge Tatel offers no evidence for that suggestion.

8

trade journals, Dr. Scheffman concluded that "'[o]ther' supermarkets are competing vigorously for the purchases made by shoppers at [Whole Foods] and [Wild Oats]." Scheffman Expert Report ¶ 212, at 77. Whole Foods "recognizes the fact that it has to appeal to a significantly broader group of consumers than organic and natural focused consumers." *Id.* ¶ 279, at 108. The record shows that Whole Foods has made progress: Most products that Whole Foods sells are not organic. Conversely, conventional supermarkets have shifted towards "emphasizing fresh, 'natural' and organic" products. *Id.* ¶ 215, at 80. "[M]ost of the major chains and others are expanding into private label organic and natural products." *Id.* ¶ 220, at 85; *see also id.* ¶ 219, at 83-85 (listing changes in other supermarkets).

So the dividing line between "organic" and conventional supermarkets has blurred. As the District Court aptly put it, the "train has already left the station." *Whole Foods*, 502 F. Supp. 2d at 48. The convergence undermines the threshold premise of the FTC's case. This is an industry in transition, and Whole Foods has pioneered a product differentiation that in turn has caused other supermarket chains to update their offerings. These are not separate product markets; this is a market where all supermarkets including so-called organic supermarkets are clawing tooth and nail to differentiate themselves, beat the competition, and make money.

The District Court's summary of the evidence warrants extensive quotation:

> In sum, while all supermarket retailers, including Whole Foods, attempt to differentiate themselves in some way in order to attract customers, they nevertheless compete, and compete vigorously, with each other. The evidence before the Court demonstrates that conventional

9

or more traditional supermarkets today compete for the
customers who shop at Whole Foods and Wild Oats,
particularly the large number of cross-shopping
customers – or customers at the margin – with a growing
interest in natural and organic foods.  Post-merger, all of
these competing alternatives will remain.  Based upon the
evidence presented, the Court concludes that many
customers could and would readily shift more of their
purchases to any of the increasingly available substitute
sources of natural and organic foods.    The Court
therefore concludes that the FTC has not met its burden
to prove that "premium natural and organic
supermarkets" is the relevant product market in this case
for antitrust purposes.

*Id.* at 36.[3]

## II

In an attempt to save its merger case despite its inability
to meet the test reflected in the Merger Guidelines and applied
in *Staples*, the FTC cites marginally relevant evidence and
advances a scattershot of flawed arguments.

*First*, the FTC says that so-called organic supermarkets
like Whole Foods and Wild Oats constitute their own product

---

[3] A showing that the merged entity would possess market
concentration in a defined product market is *necessary* but not
*sufficient* to establish an antitrust violation.  *See United States v.
Baker Hughes Inc.*, 908 F.2d 981, 985 (D.C. Cir. 1990) (listing
factors that might militate against finding an antitrust violation,
even assuming market concentration exists).  I need not address the
other necessary components of the FTC's case, however, because
the FTC has not satisfied the threshold requirement of showing that
the merged entity would have such market concentration.

10

market because they are characterized by factors that differentiate them from conventional supermarkets. Those factors include intangible qualities such as customer service and tangible factors such as a focus on perishables.

This argument reflects the key error that permeates the FTC's approach to this case. Those factors demonstrate only product differentiation, and product differentiation does not mean different product markets. "For antitrust purposes, we apply the differentiated label to products that are distinguishable in the minds of buyers but not so different as to belong in separate markets." 2B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 563a, at 385 (3d ed. 2007). As the District Court noted, supermarkets including so-called organic supermarkets differentiate themselves by emphasizing specific benefits or characteristics to attract customers to their stores. *See FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1, 24-26 (D.D.C. 2007). They may differentiate themselves along dimensions such as "low price, ethnic appeal, prepared foods, health and nutrition, variety within a product category, customer service, or perishables such as meats or produce." Stanton Expert Report ¶ 23, at 6.

The key to distinguishing product differentiation from separate product markets lies in price information. As Professors Areeda and Hovenkamp have stated, differentiated sellers "generally compete with one another sufficiently" that the prices of one are "greatly constrained" by the prices of others. 2B AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 563a, at 384. To distinguish differentiation from separate product markets, courts thus must "ask whether one seller could maximize profit" by charging "more than the competitive price" without "losing too much patronage to other sellers." *Id.* ¶ 563a, at 385. Here, in other words, could so-called

11

organic supermarkets maximize profit by charging more than a competitive price without losing too much patronage to conventional supermarkets?  Based on the evidence regarding Whole Foods's pricing practices, the District Court correctly found that the answer to that question is no.  So-called organic supermarkets are engaged in product differentiation; they do not constitute a product market separate from all supermarkets.

*Second*, the FTC points to internal Whole Foods studies and other evidence showing that if a Wild Oats near a Whole Foods were to close, most of the Wild Oats customers would shift to Whole Foods.  But that says nothing about whether Whole Foods could impose a five percent or more price increase and still retain those customers (and its other customers), which is the relevant antitrust question.  In other words, the fact that many Wild Oats customers would shift to Whole Foods does not mean that those customers would stay with Whole Foods, as opposed to shifting to conventional supermarkets, if Whole Foods significantly raised its prices. And even if one could infer that all of those former Wild Oats customers would so prefer Whole Foods that they would shop there even in the face of significant price increases, that would not show whether Whole Foods could raise prices without driving out a sufficient number of *other* customers as to make the price increases unprofitable.  In sum, this argument is a diversion from the economic analysis that must be conducted in antitrust cases like this.  The District Court properly found that the expert evidence in the record leads to the conclusion that Whole Foods could not profitably impose such a significant price increase.[4]

---

[4]  According to Judge Tatel's opinion, the FTC's expert purported to say that Whole Foods could impose a five percent or greater price increase because of the number of Wild Oats

12

*Third*, the FTC cites comments by Whole Foods CEO John Mackey as evidence that Whole Foods perceived Wild Oats to be a unique competitor. Even if Mackey's comments were directed only to Wild Oats, that would not be evidence that Whole Foods and Wild Oats are in their own product market separate from all other supermarkets. It just as readily suggests that Whole Foods and Wild Oats are two supermarkets that have similarly *differentiated* themselves from the rest of the market, such that Mackey would be especially pleased to see that competitor vanish. Beating the competition from similarly differentiated competitors in a product market is ordinarily an entirely permissible competitive goal. Saying as much, as Mackey did here, does not mean that the similarly differentiated competitor is the *only* relevant competition in the marketplace. Moreover, Mackey nowhere says that the merger would allow Whole Foods to significantly raise prices, which of course is the issue here. In any event, intent is not an element of a § 7 claim, and a CEO's bravado with regard to one rival cannot

---

customers who would switch to Whole Foods rather than conventional supermarkets. Tatel Op. at 6 (citing Rebuttal Expert Report of Kevin M. Murphy ¶ 32 (July 13, 2007)). But that ambiguous statement constituted a single, unexplained sentence in the middle of a lengthy report. Moreover, the expert apparently based his conclusion entirely on the so-called "Project Goldmine" analysis of diversion ratios associated with store closures – that is, of the number of Wild Oats customers who would switch to Whole Foods in the event that a Wild Oats store closes and Whole Foods prices remain constant. As the expert himself appeared to acknowledge, *see* Murphy Report ¶ 32 (noting that "marginal and average diversion ratios could be different"), the data do not necessarily shed any light on how many customers would continue to shop at a merged Wild Oats-and-Whole Foods entity in the event that the entity uniformly increased prices. All of this no doubt explains why the FTC never even mentioned this aspect of its expert's report in the argument section of its opening brief.

13

alter the laws of economics:  Mere boasts cannot vanquish
real-world competition – here, from Safeway, Albertson's,
and the like.  As Judge Easterbrook has explained, "Firms
need not like their competitors; they need not cheer them on
to success; a desire to extinguish one's rivals is entirely
consistent with, often is the motive behind, competition."
*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d
1396, 1402 (7th Cir. 1989).  And "[i]f courts use the vigorous,
nasty pursuit of sales as evidence of a forbidden 'intent', they
run the risk of penalizing the motive forces of competition."
*Id.*  "Intent does not help to separate competition from
attempted monopolization . . . ." *Id.*

*Fourth*, the FTC says that a study by its expert, Dr.
Murphy, demonstrates that Whole Foods's profit margins
decreased in geographic areas where it competed against Wild
Oats.  But the relevant inquiry under the Merger Guidelines is
prices.  And Dr. Murphy did not determine whether Whole
Foods *prices* ever differed as a result of competition from
Wild Oats.

Moreover, there was only a slight difference between
Whole Foods margins when Wild Oats was in the same area
and when it was not.  The overall difference was 0.7 percent,
which Dr. Murphy himself recognized was not statistically
significant.  The FTC's evidence on margins is wafer-thin and
does not suffice to show that organic stores constitute their
own product market.

*Fifth*, the FTC points to evidence that Whole Foods's
entry into a particular area, unlike the entry of conventional
supermarkets, caused Wild Oats to lower its prices.  Dr.
Murphy's reliance on Wild Oats's reaction to Whole Foods's
entry is questionable.  Dr. Murphy based his entire analysis on
a meager two events, hardly a large sample size.  In addition,

14

Dr. Murphy's analysis did not control for the reaction of
conventional supermarkets to Whole Foods's entry. In other
words, he *assumed* that the relevant product market was so-
called organic supermarkets (the point he was trying to prove)
and therefore assumed that all changes in Wild Oats's prices
were directly caused by Whole Foods's entry. But if
conventional supermarkets also lowered prices to compete
with Whole Foods when Whole Foods entered, Wild Oats's
price decreases may well have been due to the overall
reduction in prices by all supermarkets in the area. If that
were true, the relevant product market would obviously be all
supermarkets, not just so-called organic supermarkets. Dr.
Murphy's analysis never confronted that possibility or the
complexity of how competition works in this market; his
analysis appears to have assumed the conclusion and reasoned
backwards from there.

Moreover, the fact that Whole Foods and Wild Oats went
toe-to-toe on occasion does not mean that they did not also go
toe-to-toe with conventional supermarkets, which is the key
question. And it is revealing that despite having access to the
necessary data for six such events, Dr. Murphy did not
analyze the effect of a Wild Oats exit on Whole Foods's
prices. As Dr. Scheffman wrote: "A number of [Wild Oats]
stores have closed . . . . [Dr. Murphy] has done no analysis to
assess the effects of those store exits in the local shopping
areas. . . . This is a curious omission, since such evidence, if
reliable and reliably analyzed, would be relevant to the issue
of what happens in local market areas in which a [Wild Oats]
store closes." Scheffman Rebuttal ¶ 63, at 21.

The bottom line is that, as the District Court found, there
is no evidence in the record suggesting that Whole Foods
priced differently based on the presence or absence of a Wild
Oats store in the area. That is a conspicuous – and all but

15

dispositive – omission in Dr. Murphy's analysis and in the
FTC's case.

*Sixth*, the FTC cites the openings of three Earth Fare
stores near Whole Foods stores in North Carolina, which
caused decreases in Whole Foods's prices in those areas.  But
soon after those entries, Whole Foods's prices returned to
normal levels.   So the record hardly shows the sort of
"nontransitory" price changes that are the touchstone of
product-market definition.  *See* Merger Guidelines § 1.11.  A
price increase ordinarily must last "for the foreseeable
future," *id.*, considered by some to be more than a year, to
qualify as "nontransitory."  *See* 2B AREEDA & HOVENKAMP,
ANTITRUST LAW ¶ 537a, at 290.  Moreover, the entry of a
Safeway store in Boulder, Colorado, had a similar short-term
impact on Whole Foods, indicating that whatever inference
should be drawn from the Earth Fare entries cannot be limited
to so-called organic supermarkets but rather applies to
conventional supermarkets.

The FTC's reference to Earth Fare mistakenly focuses on
a few isolated trees instead of the very large forest indicating
a competitive market consisting of all supermarkets.  In short,
I fail to see how Whole Foods's *temporary* price changes to
compete against three Earth Fare stores in North Carolina
could possibly be a hook to block this nationwide merger of
Whole Foods and Wild Oats.

III

A

The opinions of Judge Brown and Judge Tatel rest on two
legal points with which I respectfully but strongly disagree.

16

*First*, the Court's decision resuscitates the loose antitrust standards of *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), the 1960s-era relic. *See, e.g.*, Brown Op. at 16 ("We look to the *Brown Shoe* indicia . . . ."); Tatel Op. at 9 ("*Brown Shoe* lists 'distinct prices' as only one of a non-exhaustive list of seven 'practical indicia' that may be examined to determine whether a separate market exists.") (citation omitted). This is a problem because *Brown Shoe*'s brand of free-wheeling antitrust analysis has not stood the test of time. *See, e.g.*, EINER ELHAUGE & DAMIEN GERADIN, GLOBAL ANTITRUST LAW AND ECONOMICS 874 (2007) ("Modern practice takes a much more rigorous approach to market definition [than *Brown Shoe*]"); 4 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 913a, at 62 (2d ed. 2006) ("One alternative that we do not recommend is a return to *Brown Shoe*'s language of 'submarkets'").

As demonstrated in this Court's most recent merger case, the practical indicia test of *Brown Shoe* no longer guides courts' merger analyses because it does not sufficiently account for the basic economic principles that, according to the Supreme Court, must be considered under modern antitrust doctrine. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715-16 (D.C. Cir. 2001) (not applying *Brown Shoe* practical indicia test; instead using the economically grounded Herfindahl-Hirschman Index test for market definition employed in *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997)); *cf. Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2718 (2007) ("the antitrust laws are designed primarily to protect interbrand competition"); *State Oil Co. v. Khan*, 522 U.S. 3, 14 (1997) ("Our analysis is also guided by our general view that the primary purpose of the antitrust laws is to protect interbrand competition."); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) (Posner, J.) (noting the "most important developments that cast doubt on the

17

continued vitality of such cases as *Brown Shoe*”).  Judge Bork forcefully catalogued the flaws in the *Brown Shoe* approach 30 years ago in his landmark antitrust book; indeed, his cogent critique helped usher *Brown Shoe* and several other cases to the jurisprudential sidelines.  *See* ROBERT H. BORK, THE ANTITRUST PARADOX 210, 216 (1978) (“It would be overhasty to say that the *Brown Shoe* opinion is the worst antitrust essay ever written. . . .  Still, all things considered, *Brown Shoe* has considerable claim to the title. . . .  *Brown Shoe* was a disaster for rational, consumer-oriented merger policy.”); George L. Priest, *The Abiding Influence of* The Antitrust Paradox, 31 HARV. J.L. & PUB. POL’Y 455, 459 (2008) (praising Judge Bork’s criticism of the “now notorious, though then mainstream” *Brown Shoe* opinion).

The Court’s revival of the loose *Brown Shoe* standard threatens to reverse this trend and to upend modern merger practice.[5]

*Second*, the opinions of Judge Brown and Judge Tatel both dilute the standard for preliminary injunction relief in antitrust merger cases, such that the FTC apparently need not establish a “likelihood of success on the merits.”  *Heinz*, 246

---

[5] As two antitrust commentators perceptively stated:  “The basic problem with the FTC’s position in *Whole Foods* was that it lacked the pricing evidence it had in *Staples*, which showed that customers did not go elsewhere if the office superstores increased their prices.  *Whole Foods* is an attempt by the FTC to persuade a court that if you take a CEO’s statements about a merger and stir it in with evidence showing the existence of several ‘practical indicia’ from *Brown Shoe*, the resulting mixture should trump objective evidence about how customers would react in the event of a price increase.”  Carlton Varner & Heather Cooper, *Product Markets in Merger Cases: The* Whole Foods *Decision* (Oct. 2007), www.antitrustsource.com.

18

F.3d at 714.  In particular, Judge Brown and Judge Tatel rely heavily on their belief that: "In this circuit, the standard for likelihood of success on the merits is met if the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  Tatel Op. at 2 (internal quotations and citations omitted); *see also id.* at 10, 12; Brown Op. at 8 (indicating that "the FTC will usually be able to obtain a preliminary injunction blocking a merger" by satisfying the same test).

In applying this watered-down test for issuing a preliminary injunction in FTC merger cases, Judge Brown and Judge Tatel rely on language contained in our opinion in *Heinz*.  However, *Heinz* only *assumed* this particular gloss on the "likelihood of success on the merits" requirement for preliminary injunctions based on a concession in the case. *See Heinz*, 246 F.3d at 715 (D.C. Cir. 2001) ("This specific standard was articulated by the court below, and it is a standard to which the appellees have not objected.") (citation omitted).  *Heinz* did not hold that this gloss was the proper meaning of 15 U.S.C. § 53(b) in FTC preliminary injunction merger cases.[6]

---

[6] The gloss on § 53(b) appears to have arisen originally in other circuits around the middle of the 20th century in connection with a more general view that a lighter "likelihood of success" standard is appropriate whenever the balance of equities weighs strongly in favor of issuing an injunction.  *Compare FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978) (Appendix to Statement of MacKinnon & Robb, JJ.) (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (which noted in the FTC merger context that "if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the

19

   This "serious questions" standard is inconsistent with the relevant statutory text.  The statute unambiguously requires that courts consider "the Commission's likelihood of ultimate success" when the FTC seeks to preliminarily enjoin a merger.  15 U.S.C. § 53(b).[7]

---

plaintiff has raised questions going to the merits so serious . . . .")), *with Omar v. Harvey*, 416 F. Supp. 2d 19, 28 (D.D.C. 2006) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842-44 & n.1 (D.C. Cir. 1977) (which noted outside the FTC merger context that courts may generally apply the relatively lax "serious questions" approach *only* "when confronted with a case in which the other three [preliminary injunction] factors strongly favor interim relief")).  But as explained below in footnote 7, Congress in 1973 codified a preliminary injunction standard for FTC merger cases that specifically directs courts to consider the Commission's "likelihood of ultimate success."  15 U.S.C. § 53(b).  And as explained in the text, the Supreme Court recently repudiated the "serious questions" approach to preliminary injunctions in general by requiring a likelihood of success showing in all cases, regardless of whether the balance of equities weighs in favor of the injunction.  *See Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008).

   [7] In justifying his adoption of the "serious questions" test for likelihood of success, Judge Tatel highlights the "unique 'public interest' standard in 15 U.S.C. § 53(b)."  Tatel Op. at 3 (citing *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)); *see also id.* at 3.  But the statute explicitly *preserves* the traditional likelihood of success requirement.  *See* § 53(b) ("Commission's likelihood of ultimate success").  What makes § 53's standard for preliminary injunctions "unique," as we have explained, is that the FTC need not show irreparable harm and, secondarily, that private equities are subordinated to public equities.  *See FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1081-83 (D.C. Cir. 1981) ("The case law Congress codified removes irreparable damage as an essential element of the preliminary injunction proponent's case and permits the judge to presume from a likelihood of success showing that the public interest will be served by interim relief."); *see also Heinz*, 246 F.3d at 727 n.25; *Exxon Corp.*, 636 F.2d at 1343.  Far from reading the

20

There is a significant difference, moreover, between the relaxed "serious questions" standard applied by Judge Brown and Judge Tatel and the traditional likelihood of success standard – as the Supreme Court explained just a few months ago in *Munaf v. Geren*, 128 S. Ct. 2207 (2008), *rev'g sub nom. Omar v. Harvey*, 479 F.3d 1 (D.C. Cir. 2007).  To be sure, that case did not involve a merger; but the Supreme Court there did address the general likelihood-of-success preliminary injunction standard – the same standard that is expressly articulated in 15 U.S.C. § 53(b).  The District Court in the *Omar* litigation – like Judge Brown and Judge Tatel here – had concluded that a preliminary injunction was justified because the case presented questions "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation."  *Omar v. Harvey*, 416 F. Supp. 2d 19, 23-24 (D.D.C. 2006) (citation omitted).  This Court then affirmed the District Court's preliminary injunction.  *See Omar v. Harvey*, 479 F.3d 1, 11 (D.C. Cir. 2007) (concluding that the Court "need not address" the merits of petitioner's claims).

But the Supreme Court unanimously rejected that lesser "serious questions" standard as too weak and not equivalent to the "likelihood of success" necessary for a preliminary injunction to issue.  *See Munaf*, 128 S. Ct. at 2219 ("We begin with the basics. . . .  [A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'") (citations omitted); *see also Winter v. NRDC*, 2008 WL 4862464 at *9 (Nov. 12,

---

"likelihood of ultimate success" language out of the statute, we have recognized that the statutory phrase "weighing the equities and considering the likelihood of ultimate success" was specifically added by the Conference Committee and that this "deliberate addition" should not "be brushed aside as essentially repetitive or meaningless."  *Weyerhaeuser*, 665 F.2d at 1081.

21

2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits") (citing *Munaf*, 128 S. Ct. at 2218-19). And the Supreme Court directly criticized the approach of the District Court and this Court in the *Omar* litigation: "one searches the opinions below in vain for any mention of a likelihood of success as to the merits." *Munaf*, 128 S. Ct. at 2219.

The Court in this case repeats the same mistake made in *Omar* of watering down the preliminary injunction standard. Both Judge Brown and Judge Tatel approve the FTC's request for preliminary injunction without making the essential "likelihood of success" finding that is required by the statutory text and Supreme Court precedent. *See* Brown Op. at 8, 20; Tatel Op. at 1-3, 15-16. To the extent the "serious questions" standard they apply was ever appropriate for preliminary injunction merger cases, the combination of the clear statutory text in 15 U.S.C. § 53(b) and the Supreme Court decision in *Munaf* convincingly demonstrates that it is not the proper standard now.

In short, the approach of Judge Brown and Judge Tatel revives the moribund *Brown Shoe* practical indicia test and applies an overly lax preliminary injunction standard for merger cases. I respectfully disagree on both counts. In my judgment, the FTC may obtain a preliminary injunction only by establishing a likelihood of success – namely, a likelihood that, among other things, the merged entity would possess market power and could profitably impose a significant and nontransitory price increase.[8]

---

[8] The precedential effect of today's splintered decision is muddied somewhat by the fact that Judge Brown and Judge Tatel have issued individual opinions concurring in the judgment. That said, it is of course well-settled that the mere fact that there is no majority opinion does not mean that the decision constitutes no

22

---

precedent for future cases. This happens quite frequently with splintered Supreme Court decisions where there is no majority opinion. As the Supreme Court has repeatedly explained, in the vast majority of cases without a majority opinion there is still a binding holding of the Court – even if it can occasionally be difficult to determine. This is known as the *Marks* principle. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *King v. Palmer*, 950 F.2d 771, 783 (D.C. Cir. 1991) (en banc) ("implicit agreement" between judges can produce a "controlling" principle of law); *see generally Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682, 691-97 (3d Cir. 1991). Like the Supreme Court, this Court has routinely recognized that a decision without a majority opinion usually still constitutes a binding precedent. *See, e.g.*, *In re Navy Chaplaincy*, 534 F.3d 756, 759 n.2 (D.C. Cir. 2008) (construing *Hein v. Freedom From Religion Foundation*, 127 S. Ct. 2553 (2007)); *Shurberg Broadcasting of Hartford, Inc. v. FCC*, 876 F.2d 902, 910 (D.C. Cir. 1989) ("a lower federal court must do its level best to extract the holding that commanded a majority in each case to arrive at the governing principles and limitations"), *rev'd on other grounds sub nom. Metro Broad., Inc. v. FCC*, 497 U.S. 547 (1990); *Martin v. Malhoyt*, 830 F.2d 237, 247 n.28 (D.C. Cir. 1987) (citing *Marks* and noting that Justice Black's concurrence in *Barr v. Matteo*, 360 U.S. 564 (1959), "provides the 'narrowest grounds' for the Court's disposition of the case and thus constitutes the Court's holding"). Only in very rare cases do the opinions making up a majority of a court contain no common principles or common ground on which to derive any precedential holding of the court. *See Nichols v. United States*, 511 U.S. 738, 743-46 (1994) (construing *Baldasar v. Illinois*, 446 U.S. 222 (1980)); *King*, 950 F.2d at 782-85.

It is unclear whether district courts and future courts of appeals will construe this case as one of those rare situations that falls entirely outside the *Marks* rule. At a minimum, this confused decision will invite years of uncertainty and litigation over what the holding of this case is – a separate but important problem with the Court's approach.

23

B

In reaching her conclusion, Judge Brown also relies on a distinction between marginal consumers and core consumers. *See, e.g.*, Brown Op. at 19 ("In sum, the district court believed the antitrust laws are addressed only to marginal consumers. This was an error of law, because in some situations core consumers, demanding exclusively a particular product or package of products, distinguish a submarket."). But the FTC never once referred to, much less relied on, the distinction between marginal and core consumers in 86 pages of briefing or at oral argument. The terms "marginal consumer" and "core consumer" are nowhere to be found in its briefs.

In any event, I respectfully disagree with Judge Brown's emphasis on core customers. For a business to exert market power as a result of a merger, it must be able to increase prices (usually by five percent or more) while retaining enough customers to make that price increase profitable. *See* 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501, at 109 (3d ed. 2007) ("A defendant firm has market power if it can raise price without a total loss of sales."). If too many "marginal" customers are turned off by a price hike, then the hike will be unprofitable even if a large group of die-hard "core" customers remain active clients. Therefore, a focus on core customers alone cannot resolve a merger case. The question here is whether Whole Foods could increase prices by five percent or more without losing so many marginal customers as to make the price increase unprofitable. *See id.* ¶ 536, at 284. As discussed above, the FTC has not come close to making that showing. Moreover, there is no support in the law for that singular focus on the core customer. Indeed, if that approach took root, it would have serious repercussions because virtually *every* merger involves some core customers who would stick with the

24

company regardless of a significant price increase.  So under this "core customer" approach, many heretofore permissible mergers presumably could be blocked as anticompetitive. That cannot be the law, and it is not the law.

In a related vein, Judge Brown repeatedly suggests that Whole Foods and Wild Oats engage in "price discrimination" – more specifically, Judge Brown asserts that organic supermarkets "discriminate on price between their core and marginal customers, thus treating the former as a distinct market."  Brown Op. at 17, 19.  But this assertion has no factual support in the record.  For antitrust purposes, price discrimination normally involves one seller charging different prices to different customers for the same product.  *See* 2B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 517a (noting as an indication of market power "systematic price discrimination, as when a seller can identify two (or more) groups of customers with different demands and charge each group different prices even though its cost of serving each group is the same").  If there is price discrimination in an industry, then under certain circumstances a relevant market may be defined to include only those customers who pay the higher price.  *See* Horizontal Merger Guidelines § 1.12.  In this case, however, neither Judge Brown nor the FTC has pointed to any evidence suggesting either that price discrimination occurred before this merger or that the merged entity will be able to price-discriminate.  In other words, there is no reason to think that "core" as opposed to non-core customers ever pay higher prices for the same products in organic supermarkets.

IV

In the end, the FTC's case is weak and seems a relic of a bygone era when antitrust law was divorced from basic

25

economic principles. The record does not show that Whole Foods priced differently based on the presence or absence of Wild Oats in the same area. The reason for that and the conclusion that follows from that are the same: Whole Foods competes in an extraordinarily competitive market that includes all supermarkets, not just so-called organic supermarkets. The merged entity thus could not exercise market power such that it could profitably impose a significant and nontransitory price increase. Therefore, there is no sound legal basis to block this merger.

The issues presented in this case are important to antitrust regulators and practitioners, to potentially merging companies, and ultimately to the overall economy. The splintered panel opinions will create enormous uncertainty, debate, and litigation over the meaning and effect of this decision. And to the extent common principles and holdings are derived from the opinions of Judge Brown and Judge Tatel, those principles will authorize the FTC to obtain preliminary injunctions and block mergers based on a watered-down preliminary injunction standard and without sufficient regard for the economic principles that have undergirded modern antitrust law. That will give the FTC far greater power to block mergers than the statutory text or Supreme Court precedents permit.

* * *

I respectfully dissent.